**FILED** 29

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AUG 2 9 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

GRASS LAKE ALL SEASONS RESORT,
INC. (GLASR), a Delaware corporation,
                    Plaintiff/Counter-Defendant,

Case Number:  01-CV-74386

v.

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA,
                    Defendant/Counter-Plaintiff,

AND

COUNTY OF JACKSON, a Michigan county,
ALL SEASONS GRASS LAKE
CORPORATION, a Nevada corporation, and
GUARDIAN CREDIT CORPORATION, a
California corporation,
                    Defendants/Counter-Defendants.
_____/

**OPINION AND ORDER:
1) DENYING SUMMARY JUDGMENT TO GRASS LAKE ALL SEASONS RESORT
(a) AS TO ITS QUIET-TITLE CLAIM AGAINST THE UNITED STATES AND
(b) AS TO THE UNITED STATES' COUNTERCLAIM; AND
2) GRANTING THE UNITED STATES SUMMARY JUDGMENT ON ITS
COUNTERCLAIMS**

Now before the Court is Plaintiff Grass Lake All Seasons Resort, Inc.'s ("GLASR" or

"Plaintiff") motion for summary judgment on its quiet-title claim against Defendant United

States and on the United States' foreclosure counterclaim. Also before the Court is the

Defendant United States' motion for summary judgment on its counterclaim. The Court heard

oral argument on these motions.[1]

_____

[1]Since oral argument, GLASR's counsel was granted leave to withdraw, effective April 18,
2005.

Having considered the entire record, and for the reasons that follow, the Court: 1) GRANTS Defendant United States' counterclaims; and 2) DENIES Plaintiff GLASR summary judgment (a) on GLASR's quiet-title claim against the United States and (b) as against the United States' counterclaim.

## I. FACTS

The pertinent facts are as follows.  All Seasons Resort, Inc. ("ASR"), whose state of incorporation was Washington (Pl.'s Ex. F at 1), owned and operated a membership resort system consisting of multiple campgrounds (Pl.'s Ex. 5 at 1).  Raymond Novelli ("Novelli") owned 75% of ASR's voting stock. (*Id.* at 6-7.)  Novelli was the President, CEO, Director, and Chairman of the Board of ASR from the time that his group acquired it in 1986 until its liquidation in 1997.  (Novelli Dep. at 149-50.)  The Schulz Family Trust owned the remaining 25% of ASR's voting stock. (Pl.'s Ex. 5 at 6.)  Hans Schulz ("Schulz"), Novelli's brother-in-law, is the trustee and creator of the Schulz Family Trust.  (Ex. 41).  Marlies Novelli, Novelli's wife and Schulz's sister, was the Secretary of ASR.  (Pl.'s Ex. F at 1; Novelli Dep. at 11-12.)  By warranty deeds, which were recorded on November 8, 1984, ASR became the fee simple owner of three parcels of land comprising 9625 Knight Road, Grass Lake, Michigan (the "Grass Lake property"), the property at issue.  (Pl.'s Ex. B & C)

### A. The Apollo Group, Ltd., Mortgage

The Apollo Group, Inc. ("TAG, Inc."), which was incorporated in California on May 29, 1985, is the general partner of The Apollo Group, Ltd, ("TAG, Ltd.") a limited partnership.[2]

---

[2]Where no distinction is made between The Apollo Group, Inc., and The Apollo Group, Ltd, they will be referred to collectively as "TAG."

TAG was formed to lend money to ASR. (Novelli Dep.2 at 167). Novelli was the President of TAG when it was incorporated. (*Id.* at 104). Novelli is also a Director of TAG, Inc., and, as one of only three shareholders, owns 25% of its stock. (Schulz Aff. Ex. 2 at 2; Pl.'s Br. at 4; Def.'s Resp. at 6.) Schulz is the Vice-President and a Director of TAG, Inc., and owns 51% of its stock. (Schulz Aff. Ex. 2 at 2.; Pl.'s Br. at 4.) Marlies Novelli is the Secretary and a Director of TAG, Inc., and owns 24% of its stock. (*Id.*)

On November 21, 1986, ASR executed a promissory note in favor of TAG, Ltd. for $1 million, with interest payable quarterly, and the balance due on April 28, 1989; the note recites that mortgages secure it. (Ex. 4, Novelli Dep). Thus, on January 12, 1987, ASR granted a properly-recorded, second-priority mortgage[3] to TAG, Ltd. in the principal amount of $1 million. (Schulz Aff. Ex. 2 at 2; Pl.'s Ex. D at 1.; Pl.'s Br. at 4.) Before 1997, TAG did not take in any income, make any payments, or have any employees. (Novelli Dep.1 at 175-76).

### B. Federal Tax Liens

The United States has made assessments in ASR's name for still-unpaid employment taxes, penalties, and interest for various quarters in 1986, 1987, 1988, 1989, 1990, 1994, 1995, and 1996. The United States has made assessments in ASR's name for still-unpaid

---

[3]Also on that date, ASR had granted a first-priority mortgage to Barclays American/Business Credit, Inc. (Compl. at ¶ 13), which assigned the mortgage to Defendant Guardian Credit Corporation on August 27, 1990, in a later-recorded document. (Pl.'s Ex. E)

By deed dated on November 19, 1992, and recorded on April 11, 1995, ASR purported to convey parcel three of the Grass Lake property to Defendant All Seasons Grass Lake Corporation, a Nevada corporation that is ASR's wholly-owned subsidiary. (Compl. at ¶ 16; Pl.'s Ex. F; Novelli Dep.2 at 172-74.) According to the United States, ASR's conveyance of this parcel to ASGLC has subsequently been ignored. (Def.'s Br. at 18.) GLASR also contends that ASGLC's interest in the Grass Lake property is invalid. (Compl. at ¶ 67.)

uncmployment taxes, penalties, and interest for the years 1986, 1987, 1988, 1990; for still-unpaid

income taxes, penalties, and interest for the ycar 1988; and for still-unpaid penalties for failure to

filc Form W-2s and interest for the years 1988 and 1990. On the dates of these assessments, the

United States sent ASR notice of them as well as demands for their payment. As to the above

unpaid assessments, ASR owes the United States the sum of $11,766,096.18, plus interest and

other statutory additions accruing from and after March 29, 2003. (Estrada Dep.)

The United States has made assessments in GLASR's name for still-unpaid employment

taxes, penalties, and interest for various quarters in 2001, 2002, and 2003. The United States has

made assessments in GLASR's name for still-unpaid unemployment taxes, penalties, and interest

for the year 2001. On the dates of these assessments, the United States sent GLASR notice of

them as well as demands for their payment. As to the above unpaid assessments, GLASR owes

the United States the sum of $51,328.37 plus interest and other statutory additions accruing from

and after March 29, 2003. (Estrada Dep.)

## C. ASR's Bankruptcies

On February 8, 1987, ASR filed a chapter 11 bankruptcy pctition with the Unitcd Statcs

Bankruptcy Court for the Central District of California, Casc No. SA87-967 JR. (Ex. 34) On

March 16, 1990, ASR again filed for bankruptcy in the United States Bankruptcy Court for the

Central District of California, Case No. SA90-1806 JR. (Ex. 35).

In the summer of 1996, Finova Capital Corporation, a mortgagee of ASR, filed in the

United States District Court for the District of Arizona a complaint secking the appointment of a

receiver over all of ASR's assets and operations. (Compl. ¶ 17; Ex. 36) On August 29, 1996, the

Arizona district court, in thc case captioned <u>Finova Capital Corporation v. All Seasons Resorts,</u>

4

Inc., Case No. 96-CV-1373 PHX RGS, held an *ex parte* hearing on Finova's *ex parte* application

for the emergency appointment of a receiver. (Ex. 37). At that hearing, Dario Moscoso

("Moscoso"), Novelli's former Chief Financial Officer ("C.F.O.") testified. (Ex. 38). Moscoso

subsequently submitted an affidavit addressing Novelli, ASR, and the Novelli Organizations.[4]

(Ex. 40) The Arizona district court ordered the appointment of a receiver over all of ASR's

assets and business operations. (Pl.'s Ex. G; Ex. 39) Denying ASR's motion to vacate the

---

[4]Specifically, Moscoso averred to the following: 1) Novelli had hired him, on May 3, 1993, as the C.F.O. for 26 specific corporations, including ASR, all of which shared a common headquarters in Newport Beach, California; 2) he had served as C.F.O. for all of those companies, reporting only to Novelli, until his resignation on August 19, 1996; 3) Novelli controlled all of the companies' daily operations; 4) Novelli gave instructions about all of the companies, even those for which Novelli was not an officer, director, employee, or shareholder, to their respective officers, and those officers always followed his instructions; 5) most of the companies for which Moscoso worked had never actually issued share certificates; 6) he observed Novelli set up sweep accounts by which revenue deposits of various operating accounts would be swept into a central account daily, and direct the allocation of the funds from the central account, giving his personal debts priority; 7) Novelli's companies, including ASR, paid for the acquisition and/or operation of luxury vehicles, homes, yachts, art, and antiques for Novelli's personal use, and Novelli never compensated the companies for those expenditures; 8) Novelli exercised complete domination and control over the assets of the Schulz Family Trust, such as the condominium in which Novelli lived, for which Moscoso had prepared the acquisition documents, and that the Schulz Family Trust was the nominal owner of a jet airplane even though another company paid for the jet's down payment, loan payments, and operating expenses and Novelli used the jet for personal business; 9) Novelli informed Moscoso that Novelli did not have any bank or depository accounts in his own name in the United States because he wanted to avoid creditors' garnishments or levies; 10) Novelli often instructed Moscoso to switch Novelli's employment from one entity to another to prevent creditors from garnishing his wages; 11) ASR and other companies paid for credit card debt that Novelli personally incurred; 12) Moscoso observed and assisted Novelli in obtaining currency from his companies on many occasions; 13) on at least 11 occasions, Novelli acquired a new entity, encumbered the entity's assets with excessive debt, used the revenue that the entity generates for unrelated purposes, and then put the entity into bankruptcy when the creditors begin to complain; and 14) on several occasions, Novelli directed Moscoso to prepare accounting data and false back-up documentation, such as fake promissory notes or other evidence of cash payments that were never made, to substantiate a claim by one of Novelli's entities to the bankruptcy estate's proceeds of another of Novelli's entities. (Ex. 40)

appointment order, the Arizona district court found that: 1) at the same time that ASR was failing to pay its employees, the IRS, and for its utilities, it was transferring money to affiliated companies; 2) ASR defaulted on its numerous obligations because its revenue was diverted to improper uses outside of ASR, and 3) Novelli and Marlies Novelli were not credible witnesses. (Ex. 42).

On July 11, 1997, ASR filed a third petition for bankruptcy under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "ASR bankruptcy").[5] (Pl.'s Ex. 5 at 1.)  On November 4, 1997, the bankruptcy court entered an order (the "bankruptcy-sale order") approving the sale of the Grass Lake property to TAG, Ltd. for $170,000, which was to be offset against TAG, Ltd.'s secured claim.[6] (Pl.'s Ex. 1 at 4; Def.'s Resp. at 5.)  Per the bankruptcy-sale order, TAG, Ltd. took title to the Grass Lake property "free and clear of all junior liens, claims, encumbrances, or interests" and "subject only to . . . any and all property taxes and related property tax claims or liens, and . . . all other valid and perfected liens, if any, . . . [that] are senior to the lien held by the Apollo Group."[7] (Pl.'s Ex. 1 at 4; P's Ex. M & N.)  The bankruptcy-sale order also found that "all

_____

[5]Although ASR filed its voluntary petition in the Riverside Division, which styled the case In re All Seasons Resorts, Inc., Case No. RS97-22134-MG, the bankruptcy court subsequently transferred the case to its Santa Ana Division, re-numbering the case to SA 97-22932-JR. (Pl.'s Ex. 5 at 16; Pl.'s Ex. K.)

[6]While the bankruptcy-sale order approved the transfer of the property to "the Apollo Group," it had previously defined "the Apollo Group" as "the Apollo Group, Ltd., by its General Partner Apollo Group, Inc." (Dep. Ex. 5).

[7]The bankruptcy-sale order also approved the sale of real properties known as Hidden Valley, in Wisconsin, and Skyview, in Pennsylvania, to "Hans Schulz in trust for the Barclays Noteholders" for an offset against Barclays' secured claim, and approved the sale of real property known as Rogers Lake, in Michigan, to "Hans Schulz in trust for the Security Capital

buyers pursuant [to] 11 U.S.C. § 363(k) purchased in good faith pursuant to 11 U.S.C. § 363(m)." (Pl.'s Ex. 1 at 3.)  However, the bankruptcy-sale order provided as follows:

> . . . [N]otwithstanding the foregoing, the Court makes no finding as to the nature of the estate's interest in the assets described above, or as to the extent, validity, or priority of liens, claims, encumbrances against, or interests in such assets, including the liens asserted by the entities to which the assets are being sold hereunder.

(Pl.'s Ex. 1 at 7.)  The IRS, by and through its attorney of record, appeared in ASR's bankruptcy proceedings.[8]  (P's Ex. 1; Def.'s Interrogatory).  By deed executed on January 23, 1998, and recorded on February 25, 1998, the Bankruptcy Trustee transferred record title to the Grass Lake Property to TAG, Inc., as general partner of TAG, Ltd.  (Pl.'s Ex. O at 1.)  After approving the Bankruptcy Trustee's Final Report and Account, the bankruptcy court, on August 5, 1998, dismissed ASR's bankruptcy case. (Pl.'s Ex. 8)

### D.  Bankruptcy Filing of TAG, Inc.

On March 16, 1998, TAG, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan, commencing the case styled In re Apollo Group, Inc., Case No. 98-CV-44951.  (Pl.'s Ex. P).  On March 31, 2000, the district court dismissed the bankruptcy case as having been filed in bad faith.  (Ex. 45).

---

Noteholders." (Dep. Ex. 5).  Yet, these properties, although sold at the bankruptcy auction per the bankruptcy-sale order, were transferred to TAG within six months of being sold.  (Dep. Ex. 17; Novelli Dep.2 at 115.)  Novelli was involved in the decision to transfer the properties.  (*Id.*) TAG gave promissory notes in exchange for the deeds to those three properties, which notes Novelli signed.  (*Id.*)

[8]The County of Jackson, by and through its attorney of record, also appeared in the proceedings.

### E. Transfer of Grass Lake Property to GLASR

By deed executed on August 10, 2000, and recorded on August 18, 2000, TAG, Inc.,

conveyed the Grass Lake property to GLASR, a Delaware corporation formed on November 18,

1999. (Pl.'s Ex. Q, 2, & 9; Def.'s Resp. at 6; Schulz Aff.) The deed states that the grantor, TAG,

Inc., and the grantee, GLASR, "are comprised of [the] same parties" such that "no funds [were]

exchanged regarding th[e] conveyance." (Pl.'s Ex. Q) TAG, Inc. owns 100% of GLASR's

shares, thereby making GLASR a wholly-owned subsidiary of TAG, Inc. (Ex. 47). Schulz was a

director of GLASR and its President from 1999 through 2001. (Schulz Aff.; Exs. 47 & 49.)

However, Novelli has been the President of GLASR since 2002. (Def.'s Resp. at 6; Def.'s Ex. 1;

Ex. 48.) Marlies Novelli is the secretary, treasurer, and a director of GLASR. (Ex. 47, 48;

Novelli Dep.2 at 84.) According to Novelli, he and Marlies Novelli are GLASR's only current

directors. (Novelli Dep.2 at 84.)

### II. PROCEDURAL HISTORY

On November 19, 2001, Plaintiff GLASR filed suit against the United States, the County

of Jackson, All Seasons Grass Lake Corporation ("ASGLC"), and Guardian Credit Corporation

("Guardian"). Count I seeks to quiet title to the Grass Lake property. (Compl. at ¶¶ 64-73.) As

to the United States, in particular, Count I alleges that the bankruptcy-sale order extinguished the

federal tax liens in ASR's name on the Grass Lake property. (*Id.* at ¶ 68.) Count II alleges that

the County of Jackson deprived Plaintiff of the Grass Lake property without due process of law

in violation of the 14th Amendment, as actionable via 42 U.S.C. § 1983. (*Id.* at ¶¶ 74-78.)

On May 6, 2003, the United States filed a Counterclaim against GLASR, ASGLC,

Guardian, and Jackson County, pursuant to 26 U.S.C. § 7401(a), for the foreclosure and sale of

8

the Grass Lake property "free and clear of any right, title, lien, claim or interest of any of the parties to this action," and for the distribution of the sale proceeds to the United States in satisfaction of the federal tax liens in ASR's and GLASR's names and to other parties.[9] (Countercl. at 29.) The requested relief, therefore, turns upon a determination that the federal tax liens in ASR's and GLASR's names have attached to the Grass Lake property. (*Id.* at 28.) As to the federal tax liens in ASR's name, in particular, the United States chiefly contends that GLASR, along with TAG, are alter egos of ASR such that the Grass Lake property belongs to ASR. (*Id.*)

On January 5, 2004, Plaintiff GLASR filed the instant motion for summary judgment. In that motion, GLASR contends that the doctrines of claim preclusion, issue preclusion, and/or waiver entitle GLASR to summary on its quiet-title claim against the United States–i.e. its claim that the bankruptcy-sale order extinguished the United States' tax liens in ASR's name on the Grass Lake property–, and on the United States' counterclaim to the extent that it seeks the foreclosure and sale of the Grass Lake property in satisfaction of tax liens in ASR's name.[10]

On April 16, 2004, the United States filed the instant motion for summary judgment on its counterclaim on the ground that its tax liens in ASR's and GLASR's names have attached, as a matter of law, to the Grass Lake property such that the property should be foreclosed and sold

---

[9]As to any "right, title, lien, claim or interest of any of the parties to this action" on the Grass Lake property, the United States alleges, in essence, that Defendants ASGLC and Guardian are alter egos of ASR. (*Id.* at ¶¶ 3-5, 27.)

[10]Because GLASR's summary-judgment motion does not challenge the United States' counterclaim to the extent that it seeks foreclosure on the Grass Lake property in satisfaction of tax liens in GLASR's name, as discussed below, GLASR's motion on the United States' counterclaim is properly characterized as one for partial summary judgment. (Def.'s Resp. at 5.)

9

to satisfy those liens. (Mot. at 3.) As to its tax liens in ASR's name, the United States contends

that, as a matter of law, GLASR is ASR's alter ego such that the liens have attached to the Grass

Lake property as held by GLASR.

## III. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show that there is no genuine issue of

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing

law[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" issue exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The

Court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52. In deciding a motion for summary judgment, the Court must draw all justifiable

inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

## A. GLASR's Summary-Judgment Motion

As noted above, GLASR contends that the doctrines of waiver, claim preclusion, and/or

issue preclusion entitle GLASR to summary on its quiet-title claim against the United States and

on the United States' counterclaim to the extent that it seeks the foreclosure and sale of the Grass

Lake property in satisfaction of tax liens in ASR's name. "[W]aiver is the intentional

relinquishment or abandonment of a known right." *United States v. Olano,* 507 U.S. 725, 733

10

(1993).

Under the doctrine of claim preclusion, "a final judgment on the merits in an action precludes a party from bringing a subsequent lawsuit on the same claim or raising a new defense to defeat a prior judgment." *Mitchell v. Chapman,* 343 F.3d 811, 819 (6th Cir. 2003); *see Katchen v. Landy,* 382 U.S. 323, 334 (1966)(holding that "[t]he normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts"). Claim preclusion bars, not only the re-litigation of a previously-adjudicated claim, but the litigation of a "claim or defense that should have been raised, but was not, in the prior suit." *Id.* Put another way, claim preclusion applies only where: 1) "the prior decision was a final decision on the merits;" 2) "the present action is between the same parties or their privies as those to the prior action"; 3) the claim in the present action was or should have been litigated in the prior action; and 4) "where an identity exists between the prior and present actions." *Id.* As to the last prerequisite, an "[i]dentity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *Id.* at 819 n.6.

Under the doctrine of issue preclusion or collateral estoppel, once a court of competent jurisdiction actually and necessarily determines an issue, "that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Wolfe v. Perry,* 412 F.3d 707, 716 (6th Cir. 2004). Issue preclusion applies where: 1) "the issue in the subsequent litigation is identical to that resolved in the earlier litigation"; 2) "the issue was actually litigated and decided in the prior action"; 3) "the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation"; 4) "the party estopped was a party to the prior litigation (or in privity with such a party)"; and 5) "the party to be estopped had

11

a full and fair opportunity to litigate the issue." *Id.*

First, GLASR contends that the bankruptcy-sale order, in directing that TAG take title to the Grass Lake property from ASR "free and clear" of all junior liens, permanently extinguished the United States' junior tax liens in ASR's name on the Grass Lake property.[11] (Pl.'s Br. at 2, 6, 11, 14.) The United States, in turn, contends that the bankruptcy-sale order did not permanently extinguish the tax liens in ASR's name, but simply discharged the property from those liens only in so far as it passed out of ASR's possession to TAG. (Def.'s Resp. at 7, 9, 16.)

Indeed, the bankruptcy-sale order expressly provided that it "makes no finding as to the nature of the estate's interest in the assets described above, or as to the extent, validity, or priority of liens, claims, encumbrances against, or interests in such assets, including the liens asserted by the entities to which the assets are being sold hereunder." (Order at 7.) The bankruptcy-sale order, therefore, expressly declined to adjudicate the "extent, validity, or priority of liens, claims, encumbrances against, or interests in" the Grass Lake property, including those of the United States. Consequently, the bankruptcy-sale order, in directing that TAG take title to the Grass Lake property from ASR "free and clear" of all junior liens, did not permanently extinguish the United States' junior tax liens in ASR's name against the Grass Lake property. Neither claim preclusion nor issue preclusion bar the United States counterclaim based upon the tax liens in ASR's name.[12]

---

[11]GLASR argues that the United States' tax liens in ASR's name, which span from May 4, 1987, to December 9, 1996, arose after TAG's security interest in the Grass Lake property was properly recorded, and, thus, are junior to TAG's interest. (Br. at 3-4, 5; Countercl. at ¶¶ 6-11.) The United States does not contest that its tax liens were junior to TAG's interest. (Resp. at 7, 9.)

[12]Indeed, as to the alleged claim preclusion, the bankruptcy-sale order cannot preclude a subsequent claim that it expressly declined to adjudicate.

12

Moreover, as the United States aptly argues, GLASR's contention that the United States waived its right to challenge such extinguishment by failing to raise such a challenge during ASR's bankruptcy proceedings, by failing to appeal the bankruptcy-sale order, and by failing to seek relief from that order pursuant to Federal Rule of Civil Procedure 60(b) necessarily fails since the premise upon which it relies fails as a matter of law. (Br. at 7-8, 15-16; Resp. at 7; Reply at 3.)

As noted above, the United States' counterclaim alleges, in part, that its federal tax liens in ASR's name have attached to the Grass Lake property because GLASR is ASR's alter ego. As a threshold matter, GLASR contends that it could only be ASR's alter ego if TAG were also ASR's alter ego. In support, GLASR underscores that GLASR is TAG's wholly-owned subsidiary such that GLASR and TAG have identical ownership. (Reply at 4.) GLASR further contends that the doctrine of collateral estoppel bars the United States from contending that TAG is ASR's alter ego and, thus, from contending, via its counterclaim, that GLASR is ASR's alter ego.[13] First, GLASR contends that the bankruptcy-sale order's unchallenged finding that TAG was a good-faith purchaser of the Grass Lake property, under 11 U.S.C. § 363(k), bars the United States from contending that TAG is ASR's alter ego and, thus, that GLASR is ASR's alter ego. ((Br. at 3 n.1.; 6, 12, 14; Reply at 5.)

Yet, a parent corporation and its wholly-owned subsidiary are distinct legal entities, and,

---

[13]Absent such an argument, the United States would not be barred from contending, via its counterclaim, that GLASR is ASR's alter ego. As the United States underscores, GLASR did not come into being until November 23, 1999, such that the United States could not have known, at the time of ASR's bankruptcy proceedings in November of 1997, that the Grass Lake property would fall into GLASR's possession or that GLASR would be ASR's alter ego. (Resp. at 17.) Moreover, the bankruptcy-sale order could not have actually litigated whether GLASR was ASR's alter ego because GLASR was not yet in existence.

13

except for their shared ownership, may well differ in many significant aspects, such as in their management, operating or financial procedures, and/or activities. *Cf. Maki v. Copper Range Co.,* 328 N.W.2d 430, 524-25 (Mich. Ct. App. 1983) (recognizing that, to protect its investment and control of the subsidiary, a parent company often shares its directors or officers with the subsidiary and monitors the subsidiary's fiscal activities, but holding that "majority stock ownership and common directors and officers, alone" will not invalidate the corporations' separate existence). Thus, TAG and GLASR's parent/subsidiary relationship would not in itself require TAG to be ASR's alter ego in order for GLASR to be so.[14]

In any event, the bankruptcy-sale order expressly declined to determine the "extent, validity, or priority" of the mortgage that TAG used to purchase the Grass Lake property. Therefore, as the United States maintains, the bankruptcy-sale order did not actually litigate the validity of TAG's mortgage–e.g. whether adequate consideration supported it–or TAG's status as ASR's alter ego. (Resp. at 10 n.12.) Indeed, the bankruptcy-sale order even expressly declined to determine the interest of ASR's bankruptcy estate in the Grass Lake property.

Moreover, contrary to GLASR's suggestion, the United States would not have had a full and fair opportunity to litigate those issues during ASR's bankruptcy proceedings. (*See* Pl.'s Br. at 3 n.1, 11, 14.) As the United States contends, bankruptcy law does not necessarily prohibit a debtor from purchasing property from its own bankruptcy estate either directly or through an alter

---

[14]Moreover, as the United States aptly noted at oral argument, the fact that GLASR received the Grass Lake property from TAG, which, in turn, received the property from ASR, does not require the United States to establish that TAG is ASR's alter ego in order to establish that GLASR is such. Rather, even if GLASR were to have received the Grass Lake property through a *bona-fide* transfer, the tax liens in ASR's name would re-attach to the Grass Lake property held by GLASR so long as GLASR is ASR's alter ego.

14

ego. *See Met-L-Wood Corp. v. Pipin,* 861 F.2d 1012 (7th Cir. 1988)(recognizing that "[i]t is

commonplace, and involves no impropriety, for the debtor himself to bid at a foreclosure sale").

Rather, a sale of a bankruptcy estate's property outside the ordinary course of business hinges

solely upon whether the sale would be in the estate's best interests. *See Matter of Energy

Cooperative, Inc.,* 886 F.2d 921, 927 (7th Cir. 1984) ("The benchmark for determining the

propriety of a bankruptcy settlement is whether the settlement is in the best interests of the

estate."); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 n.7 (holding that the

standard for approving a sale of a bankruptcy estate's estate is whether that sale would be in the

estate's best interests). (Resp. at 16.) Furthermore, according to the United States, in November

of 1997, there was no evidence that ASR's sale of the Grass Lake property to itself, via TAG as

an alter ego, would have harmed the United States because: 1) the bankruptcy-sale order did not

extinguish the federal tax liens in ASR's name or preclude them from re-attaching to the Grass

Lake property as held by ASR via an alter ego; and 2) the sale of the Grass Lake property, via the

bankruptcy-sale order, reduced the number of senior liens and, thus, improved the priority of the

United States' tax liens. (Resp. at 16-17.) The collateral-estoppel doctrine, therefore, does not

preclude the United States from contending, via its counterclaim, that TAG is ASR's alter ego.

GLASR also argues that the United States, by failing to challenge, during ASR's

bankruptcy proceedings, ASR's sale of the Grass Lake property to TAG on the ground that TAG

is ASR's alter ego, waived such a challenge. (Br. at 11, 14.) In support, GLASR cursorily

contends that TAG's ownership and control were matters of public record during ASR's

bankruptcy proceedings. (*Id.*) Yet, even if the United States were to have known that TAG's

ownership and control were similar to that which ASR had, such similarities, in themselves,

would be insufficient to sustain a claim that TAG is ASR's alter ego. Moreover, as discussed

above, the United States would have had no reason to challenge ASR's sale of the Grass Lake

property to TAG even if TAG were ASR's alter ego. *See also United States v. Olson,* No. 98-

2170, 2001 WL 817854, at *3 (N.D. Ill. July 19, 2001) (unpublished opinion) (recognizing that

the United States, by failing to object to the sale of property from the delinquent taxpayer's

bankruptcy estate, did not waive its claim that the purchaser is the taxpayer's alter ego/nominee

for purposes of the tax liens attaching to that property because such a claim, in fact, relies upon

the sale, rather than its invalidation).

Taking a different tack, GLASR contends that the United States should be equitably

estopped from arguing that GLASR is ASR's alter ego because the United States has refused to

provide GLASR with discovery on the tax liens in ASR's name on the ground that GLASR lacks

taxpayer standing to contest the merits of and to review ASR's tax liabilities. (Br. at 9.) Yet, as

the United States points out, it has done so only because and so long as GLASR has denied that it

is ASR's alter ago. (Resp. at 7 n.10.) *See Myers v. United States,* 647 F.2d 591, 604 (5th Cir.

1981) (affirming the long-standing principle that non-taxpayers cannot challenge tax

assessments).

Thus, GLASR has failed to establish that the doctrines of waiver, issue preclusion, and/or

claim preclusion entitle GLASR to summary on its quiet-title claim against the United States and

on the United States' counterclaim to the extent that it seeks the foreclosure and sale of the Grass

Lake property in satisfaction of tax liens in ASR's name. The Court, therefore, DENIES

GLASR's motion for summary-judgment. Moreover, because Plaintiff's quiet-title claim against

the United States—i.e. that the bankruptcy-sale order extinguished the United States' tax liens in

16

ASR's name on the Grass Lake property–fails as a matter of law, the Court GRANTS the United States summary judgment on this claim.[15]

## B. The United States' Summary-Judgment Motion

As noted above, the United States has moved for summary judgment on its counterclaim for the foreclosure and sale of the Grass Lake property in satisfaction of the federal tax liens in GLASR's and ASR's names.

26 U.S.C. § 6321 provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6322 provides that, unless the law specifically fixes another date, a lien under § 6321 "shall arise at the time [that] the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time."

As the Supreme Court held in *Glass City Bank v. United States,* 326 U.S. 265, 267 (1945), these two sections, when read together, establish "a continuing lien [that] covers property or rights to property in the delinquent[] [taxpayer's] hands at any time prior to [the lien's] expiration." As the Court noted, Congress could not have selected stronger language to reveal its intent to ensure the collection of taxes. *Id.* Thus, a federal tax lien, while still-extant, attaches

---

[15]The United States has asserted that, contrary to GLASR's quiet-title claim, the bankruptcy-sale order did not, as a matter of law, extinguish the federal tax liens in ASR's name on the Grass Lake property. (Mot. Reply at 10.)

even to property that the delinquent taxpayer acquires after the lien has arisen.[16]  *See United States v. Dishman Indep't Oil,* 46 F.3d 523, 525 (6th Cir. 1995) (holding that a federal tax "lien attaches to all property and rights to a taxpayer's property, including property subsequently acquired by the taxpayer").

### 1. Federal Tax Liens in GLASR's Name

In its instant summary-judgment motion, the United States contends that its federal tax liens in GLASR's name have attached, as a matter of law, to the Grass Lake property such that the property should be foreclosed and sold to satisfy those liens.  GLASR has neither responded to this contention nor designated any record evidence demonstrating otherwise.

As 26 U.S.C. § 6321 provides, a federal tax lien arises when a federal tax assessment is made and remains unpaid after notice and demand, and attaches to all of the taxpayer's property or rights to property.  *See also Glass City Bank,* 326 U.S. at 267 (holding that the federal tax lien is a continuing lien, and attaches to all property owned by the delinquent taxpayer at any time during the life of the lien).  It is undisputed that the IRS made federal employment and unemployment tax assessments in GLASR's name; that the IRS sent GLASR notices of those assessments and demands for their payment; and that those assessments remain unpaid.  (Br. at 3, 11; Estrada Aff.)  It is also undisputed that GLASR holds record title to the Grass Lake property. (Br. at 11.)  Consequently, the United States' federal tax liens arising from GLASR's unpaid

---

[16]This is so even if the delinquent taxpayer subsequently transfers the property to an unrelated third party.  *See United States v. Big Value Supermarkets, Inc.* 898 F.2d 493, 496-97 (6th Cir. 1990) (recognizing that "transfers subsequent to the attachment of a federal lien do not affect the lien in any way," and holding that, even though a third party then owned the property to which the federal lien had attached, the government had the right to seize and sell that property, to join all interested parties, and to distribute its sale proceeds according to priority).

federal tax assessments in the amount of $51,328.37, as of March 29, 2004, have attached, as a matter of law, to the Grass Lake property such that the property should be foreclosed and sold. The United States is, therefore, entitled to summary judgment on its counterclaim seeking the foreclosure and sale of the Grass Lake property in satisfaction of the federal tax liens in GLASR's name.[17]

### 2. Federal Tax Liens in ASR's Name

Concerning its tax liens in ASR's name, the United States contends that, as a matter of law, such tax liens have attached to the Grass Lake property because GLASR is ASR's alter ego and, thus, that the property should be foreclosed and sold to satisfy those liens.[18] (Br. at 10; Resp. at 12, 13.)

It is well-settled that, during the life of a federal tax lien in a delinquent taxpayer's name, the lien attaches to property that is in the name of an alter ego of the taxpayer such that the government may levy upon that property in satisfaction of the taxpayer's tax liability. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350-51 (1977); *Lemaster v. United States,* 891 F.2d 115, 119 (6th Cir. 1989).[19]  Therefore, under the above authority, because GLASR had

---

[17]At oral argument, the United States conceded that Jackson county has priority over the United States' tax liens in GLASR's name.

[18]In both its counterclaim and its response to GLASR's summary-judgment motion, the United States initially contended that GLASR is an alter ego, mere continuation, and/or nominee of ASR. However, in its pleadings on its summary-judgment motion, the United States has settled solely upon the alter-ego theory.

[19]GLASR argues that *G.M. Leasing Corp.,* 429 U.S. 338 (1977), the main authority upon which the United States relies, does not reach the issue of whether federal tax liens in a delinquent taxpayer's name attach to property that is in the name of the taxpayer's alter ego because its main holding surrounds the Fourth Amendment. (Resp. at 9.) The Sixth Circuit, however, rejected that very argument in *Lemaster v. United States,* 891 F.2d 115, 119 n.3 (6th

19

acquired the Grass Lake property during the life of the United States' tax liens in ASR's name,[20]

such liens would attach to the property if GLASR were ASR's alter ego such that the United

States could levy upon that property to satisfy ASR's tax liability.

The parties do not dispute that Michigan law controls the issue of whether GLASR is

ASR's alter ego. (Def.'s Br. at 15; Pl.'s Reply). *See PBV, Inc. v. Rossotti*, No. 98-3504, 1999

WL 220123, at *1 (6th Cir. April 6, 1999) (unpublished opinion) (holding, in the context of a

federal tax lien and levy pursuant to 26 U.S.C. § 7426, that "federal courts apply the law of the

forum state to resolve alter ego and similar questions"). Under Michigan law, courts will pierce

a corporate veil only to prevent fraud or injustice. *In re RCS Engineered Prods. Co., Inc. v.

Himmelspach*, 102 F.3d 223, 225-26 (6th Cir. 1996). This is because "[f]raud or other attempts to

evade the law justify invoking equity's power to look through and behind the legal entity of

corporate existence." *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109,

Cir. 1989).

---

[20]As the United States notes, its tax liens in ASR's name had not expired when GLASR took
title to the Grass Lake property in August of 2000. (Resp. at 8.) The limitations' period for the
collection of an unpaid federal tax assessment whether via court proceeding or levy–is ten years
from the assessment of the tax. 26 U.S.C. § 6502(a)(1) (providing that, upon the timely
commencement of a court proceeding to collect a tax, "the period during which such tax may be
collected by levy shall be extended and shall not expire until the liability for the tax (or a
judgment against the taxpayer arising from such liability) is satisfied or becomes
unenforceable"). The ten-year limitations' period is tolled for the periods during which a court
has custody or control of the taxpayer's assets as well as for six months thereafter. 26 U.S.C. §
6503(b); *see also* 26 U.S.C. § 6503(h) (tolling, in any case under Title 11 of the United States
Code, the ten-year limitations' period for any period during which the case prohibits the
Secretary from making the assessment and for 60 days thereafter or from collecting upon it and
for 6 months thereafter). Thus, according to the United States, the limitations' period for the
collection of the unpaid tax assessments against ASR, the earliest of which was made in 1986,
was tolled during and for an additional six months after each of ASR's three bankruptcy
proceedings in 1987, 1990, and 1997 such that Defendant's present action to collect upon those
assessments is timely. (Resp. at 9.) GLASR does not contend otherwise.

20

111 (6th Cir. 1989) (applying Michigan law) (internal quotation marks omitted).  In determining whether to pierce a corporate veil, courts must assess, on a case-by-case basis, "[t]he entire spectrum of relevant facts . . . in light of the corporation's economic justification."  *Id.* (internal quotation marks omitted).

"A court may find an identity between business entities and pierce the corporate veil upon proof" that: 1) the corporate entity is a mere instrumentality of another entity or individual; 2) the corporate entity was used to commit a fraud or wrong; and 3) the plaintiff suffered an unjust loss or injury. *Bodenhamer,* 873 F.2d at 112; *but see Concept One Int'l, Inc. v. Nippecraft Ltd.,* No. 96-565, 1997 WL 483248, at *5 n.2 (W.D. Mich. Feb. 14, 1997) (unpublished opinion) (holding that "Michigan law does not require a showing of fraud or illegality before the corporate form will be disregarded," but, rather, a showing of mere instrumentality and injustice will suffice, and surveying supporting and contrary case law).  A court may pierce a corporate veil when: 1) the "corporation and shareholders have complete identity of interests;" 2) "the corporation is a mere instrumentality of the shareholders;" 3) "the corporation is a device to avoid a legal obligation;" or 4) "the corporation is used to defeat public convenience, [to] justify a wrong, [to] protect fraud[,] or [t]o] defend a crime." *Id.*

The United States contends that GLASR is ASR's alter ego is a matter of law.  In support, the United States proffers the following evidence.  (Br. at 3, 20.)  GLASR's ownership is similar to that which ASR had.  Novelli directly owned 75% of ASR's stock, and the Schulz Family Trust, of which Schulz, Novelli's brother-in-law, was the trustee, owned the remaining 25%.[21]

---

[21]According to GLASR, Novelli testified that, before the trustee cancelled its stock during ASR's 1997 bankruptcy, ASR was a publicly-traded corporation with as many as 30,000 shareholders, and with multiple investors. (Resp. at 2.)  However, as the United States points out,

21

(Pl.'s Ex. 5 at 6-7.) As to GLASR's stock, Novelli owns 25%, Schulz owns 51%, and Marlies

Novelli owns 24%. (Schulz Aff. at 2; Pl.'s Br. at 4; Def.'s Resp. at 6.)

GLASR's management is identical to that which ASR had. Novelli was the President and

Chairman of the Board of ASR from the time that his group acquired it in 1986 until its

liquidation in 1997.[22] (Novelli Dep.1 at 149-50.) Marlies Novelli was ASR's Secretary. (Pl.'s

Ex. F at 1; Novelli Dep. at 11-12.) Novelli has been the President of GLASR since 2002.

(Def.'s Resp. at 6; Def.'s Exs. 1, 48.) Marlies Novelli is the Secretary, Treasurer, and a Director

of GLASR. (Id.; Exs. 47, 48; Novelli Dep.2 at 84.) According to Novelli, he and Marlies Novelli

---

Novelli's testimony actually references ASR's *second* bankruptcy proceeding in 1990. (Novelli
Dep.2 at 135; Reply at 6.) While ASR was, at one time, a publicly-traded company, ASR's
1997 bankruptcy petition, which Novelli signed, demonstrates that, by that time, Novelli owned
75% of ASR's stock with the Schulz Family Trust owning the remaining 25%. (*See also* Novelli
Dep.1 at 179-81; Novelli Dep.2 at 135-38; Reply at 6 n8.)

Moreover, although Novelli averred that he has never had any control over the Schulz
Family Trust (Novelli Aff. at ¶ 7; Resp at 8.), the trust instrument provides that Novelli is one of
the trust advisors, and that Novelli's son is one of the two beneficiaries (Ex. 41.) In any event,
because Novelli had majority control over ASR by virtue of his ownership of 75% of its stock, he
need not have obtained such control via the Schulz Family Trust.

[22]GLASR unsuccessfully attempts to downplay Novelli's role in ASR's management. First,
GLASR asserts that Novelli became the President of ASR only at the request of ASR's investors.
(Novelli Dep.1 at 158-60; Novelli Dep.2 at 135; Pl.'s Resp. at 2.) Second, GLASR contends that
several individuals, such as Mel Tari and Mike Mooney, were officers of ASR. (Novelli Dep.1 at
150-51, 156-57; Pl.'s Resp. at 2.) However, the alleged reason why Novelli became President of
ASR or the existence of other individuals serving as officers of ASR does not negate Novelli's
involvement in ASR as President.

Lastly, GLASR argues that, from the appointment of a receiver over ASR on August 29,
1996, to the liquidation of ASR's assets on November 4, 1997, Novelli was not involved with
ASR. (Novelli Dep.2 at 42; Pl.'s Resp. at 3.) As an illustration, GLASR contends that Novelli
was not involved in ASR when the bankruptcy court cancelled the memberships at the Grass
Lake property. (Novelli Dep.2 at 26; Pl.'s Resp. at 3.) However, as the United States points out,
ASR's bankruptcy petition, signed by Novelli and filed on July 11, 1997, states that Novelli was
ASR's president and owned the majority of its stock, and Novelli testified that he put ASR into
bankruptcy after the receiver's appointment. (Novelli Dep.1 at 60; Def.'s Reply at 7.)

22

are GLASR's only current directors.  (Novelli Dep.2 at 84.)

As Novelli testified, other than a new sign, there have been no changes to the Grass Lake property, to the services provided, to the staff, or to the property's daily operations or policies since the property's transfer from ASR.  (Novelli Dep.1 at 235-37, 268-69; Novelli Dep.2 at 26.)  Indeed, GLASR concedes as much, and contends that, consequently, GLASR never notified members of the Grass Lake property of its change in ownership.  (Novelli Dep.2 at 47; Pl.'s Resp at 6, 14.)

All but 5% of the current members of the Grass Lake property were members of ASR.[23]  Specifically, the Grass Lake property has about 1,400 members, and of those members only 75 joined following the transfer of the property from ASR. (Novelli Dep.1 at 285-86; Novelli Dep.2 at 31.)  Upon acquiring record title to the Grass Lake property, neither TAG nor GLASR required prior members of the property to pay new initiation fees.  (Novelli Dep.2 at 19, 47.)  GLASR uses the same procedures for finalizing membership contracts for the Grass Lake property as ASR did when it owned the property.  (*Id.* at 32.)

During its ownership by ASR, TAG, and GLASR, the Grass Lake property has always been part of a larger organization that Novelli has controlled and whose principal place of business has been in Southern California.[24]  During ASR's ownership of the Grass Lake property,

---

[23]Moreover, when TAG first acquired the Grass Lake property, it operated the property as part of the Travel America Network, which Novelli controlled.  The usage privileges for members remained the same as they were with ASR.  (Def.'s Br. at 16; Dep. Ex. 23.)

[24]Although GLASR cursorily contends that its corporate business solely involves the Grass Lake property while ASR owned and operated over ten such campgrounds (Pl.'s Resp. at 1), the Grass Lake property, as discussed below, is currently operated as part of a larger organization of several campgrounds called "All Seasons Resort, Inc."  Thus, as the United States aptly argues, there is no functional difference between the role that the Grass Lake property currently plays as

23

ASR itself was the larger organization of which the Grass Lake property was a part. ASR operated from 17672-B Cowan Avenue, Irvine, California, 92614. (Ex. 18).

From ASR's liquidation at the end of 1997 until GLASR's formation in November of 1999–during which time TAG owned the Grass Lake property–, the Travel America Network, a Southern-California based business that Novelli controlled, was the larger organization of which the Grass Lake property was a part. Travel America was formed in 1997 around the time of ASR's liquidation, and was a combination of several pre-existing campground resorts, including the Grass Lake property. (Dep. Exs. 16, 23; Novelli Dep.1 at 231-32.) Travel America provided management and accounting services for the different resorts as a collective unit, rather than as individual resorts, in the same way that the resorts are run today. (Novelli Dep.1 at 248.)

Novelli was an officer of TAG at the time that it entered into a lease with Travel America for the operation of the Grass Lake property. (Novelli Dep.1 at 232-33.) Moreover, Novelli was the President and a Director of Travel America, and, as one of three owners, controlled at least 50% of Travel America's stock. (Novelli Dep.1 at 223-25.) Novelli oversaw Travel America's daily operations just as he had with ASR, and had signature authority on Travel America's bank accounts. (*Id.* at 225, 249.)

Travel America's business address was on 17672-B Cowan Avenue in Irvine, California, the same location from which ASR had operated.[25] (Novelli Dep.1 at 247.) Travel America

---

part of that larger organization and the role that it played as part of ASR's campground organization.

[25]Moreover, from 1998 through 2001, TAG operated from the same office at 17672-B Cowan Avenue in Irvine, California, 92614, from which ASR had operated in 1997 and from which Travel America operated. (Def.'s Br. at 16; Exs. 15, 17, 43)

24

provided services that were similar to those that ASR had provided. (*Id.* at 249.) Novelli, Schulz, and Marlies Novelli provided the same services to Travel America as they had provided to ASR. (*Id.*)

After Travel America ceased operating the Grass Lake property for TAG, the property became part of a larger organization called All Seasons Resorts, Inc., of which it remains a part under GLASR's ownership. After ASR's bankruptcy, Novelli formed a Delaware corporation called ASR ("new ASR") to secure the ASR name. (Novelli Dep.1 at 89, 259, 269; Def.'s Br. at 16.) Novelli is the President of the new ASR while Marlies Novelli is its Secretary and Treasurer. (Novelli Dep.1 at 109.) Novelli testified, however, that the new ASR is "dormant" and does not operate. (*Id.*)

The internet website of "allseasonsrestorts.com" advertises a business called "All Seasons Resorts" and lists thirteen resorts, one of which is the Grass Lake property. (Dep. Ex. 22.) Novelli is a director or officer of most of the thirteen resorts. (Novelli Dep.2 at 146) Either Novelli, Marlies Novelli, or Schulz is a director or officer for all of the resorts. (*Id.* at 146). The bank records and the membership records for all of the thirteen resorts are on the same computer system, of which Schulz is in charge. (Novelli Dep.1 at 62, 69.) Schulz is responsible for the billings for all of the thirteen resorts. (Novelli Dep.1 at 69-70.) Marlies Novelli must approve any financial matters relating to any of the thirteen resorts. (Novelli Dep.1 at 83.)

All of the thirteen resorts have collective management and share employees. (Novelli Dep.1 at 55.) All of the resorts pay a pro rata share of expenses, including phone, electricity, and

25

rent, based on the number of their members.[26]  (Novelli Dep.1 at 29, 94; Novelli Dep. 2 at 257.)

The income that the Grass lake property generates is swept into a central account, and

commingled with the income that the other campgrounds generate.  (Novelli Dep.2 at 59; Dep.

Exs. 11-14.)  Specifically, all balances over $50 in GLASR's accounts are transferred daily into

another account in Guardian's name.[27]  (Id.)  Guardian's accounts automatically transfer amounts

necessary to cover checks drawn on GLASR's accounts. (Id.)  The transfers from Guardian's

accounts to GLASR's accounts have exceeded, by about $30,000 to $40,000, the transfers from

GLASR's accounts to Guardian's accounts. (Novelli Dep.2 at 74.)

According to the website, the business addresses for All Seasons Resorts, Inc. is 1762

McGaw, Irvine, California, 92614 ("the main address"),[28] and  P.O. Box 19682, Irvine,

California, 92623. (Ex 22; Def.'s Resp. at 14.)  The main address is also GLASR's business

address.  (Ex. 47.)  Yet, the main address is leased under the name "All Seasons Resorts," and

the receptionist at the main address answers the phone "All Seasons Resorts."  (Novelli Dep.1 at

90; Novelli Dep.2 at 64.)  The ASR logo is featured prominently on GLASR's membership

cards, billing statements, and Novelli's business card.  (Def.'s Br. at 17; Novelli Dep.1 at 75;

Novelli Dep.2 at 62; Dep. Exs. 2, 21.)  Indeed, Novelli included "All Seasons Resort" in the

---

[26]Novelli, Marlies Novelli, and Schulz selected Guardian Publishing, a corporation that
Novelli, Marlies Novelli, and Schulz own and control, to handle the shared expenses.  (Novelli
Dep.1 at 111.)

[27]Novelli, Marlies Novelli, and Schulz own all of Guardian's stock, and are its only officers
and directors.  (Novelli Dep.1 at 112.)  Novelli and Marlies Novelli write out checks for
Guardian.  (Novelli Dep.1 at 119.)

[28]The corporate minutes of all of the thirteen resorts are kept at the main address. (Id. at 88-
90.)

name "Grass Lake All Seasons Resort" for name recognition purposes. (Def.'s Br. at 17; Novelli

Dep.1 at 231, 260; Novelli Dep.2 at 64.)

While GLASR attempts to downplay Novelli's involvement with the Grass Lake

property,[29] Novelli oversees the operation of "All Seasons Resorts, Inc," which includes GLASR

and the Grass Lake property, as shown above. (Novelli Dep.1 at 106.) Novelli reviews and signs

the tax returns for all of the thirteen resorts, including the Grass Lake property. (Novelli Dep.2 at

82.) Novelli is the principal individual working with the IRS to resolve tax-related issues for all

of the resorts. (Novelli Dep.1 at 85.) Although Novelli testified that Marlies Novelli or Gary

Merritt, not Novelli, is responsible for approving the Grass Lake property's budget (Novelli

Dep.2 at 55-57), Novelli further testified that he is the main individual who controls the "cash" of

All Seasons Resorts, Inc. (Novelli Dep.1 at 108.). Moreover, Novelli oversees another

individual's handling of payroll and accounts payable for GLASR. (Novelli Dep.2 at 51.)

While Schulz and Marlies Novelli are the only individuals with signatory authority on GLASR's

general account, Novelli has signed checks on that account. (Novelli Dep.2 at 47, 52.)

The United States contends that the disregard of corporate formalities by Novelli and his

family illustrate that the corporations in which they are involved, while nominally-distinct, are, in

essence, one organization. For example, as the United States points out, GLASR has proffered

contradictory evidence and representations as to the identity of its President and Directors. In its

response to the United States' first set of written discovery, GLASR stated that Schulz was its

---

[29]Novelli testified that Wendy Archibald is responsible for approving any changes in the
membership contracts for the Grass Lake property, and need not consult with Novelli. (Novelli
Dep.2 at 34-35;Pl.'s Resp at 6.) Novelli further testified that he, Schulz, Marlies Novelli, Roy
Ainsworth, and employees at the resort make the decisions concerning dues for the Grass Lake
property. (Novelli Dep.2 at 78; Pl.'s Resp at 6.)

only President. (Ex. 47 at 3.) Yet, in his January 22, 2004, deposition, Novelli stated that he was GLASR's President. (Novelli Dep.1 at 43.) In its amended response to the United States' discovery, GLASR stated that Schulz was its President in 1999, 2000, and 2001, and that Novelli was its President from 2002 through 2004. (Ex. 48.) However, GLASR's corporate resolution, dated August 1, 2000, certifies Marlies Novelli as GLASR's President. (Ex. 49.) Moreover, while GLASR initially represented that Schulz is GLASR's only Director, Novelli testified that he and Marlies Novelli are GLASR's only Directors. (Ex. 47; Novelli Dep.2 at 84.)

According to the United States, GLASR has been used to commit a fraud or wrong that has unjustly injured the United States–i.e GLASR has been used to prevent the United States from applying the equity in the Grass Lake property to ASR's $11 million tax liability. (Br. at 18-19.) The Court agrees. A reasonable juror could only conclude that the "Novelli organizations" have done whatever they can to continue conducting business without paying their tax obligations.[30]

According to the United States, evidence of Novelli's fraudulent intent includes the following facts: 1) Novelli extracted large sums of money from ASR and other companies for his personal use while allowing their tax and other liabilities to remain unpaid; 2) Novelli does not use bank accounts in his own name in the United States to avoid their attachment by his creditors; 3) Novelli and Marlies Novelli have always held title to their current residence through a nominee; 4) Novelli has avoided paying the Grass Lake property's local real property taxes for over ten years, leaving a tax liability exceeding $500,000. (Def.'s Br. at 19.)

---

[30]To the extent that GLASR asserts that it could not have been used to insulate the Grass Lake property from ASR's tax obligations because the bankruptcy-sale order extinguished those obligations (Reply at 5.), such an assertion necessarily fails, as discussed above.

28

The above-outlined evidence, even when viewed in GLASR's favor,[31] demonstrates, as a matter of law, that GLASR is ASR's alter ego.  It is undisputed that GLASR holds record title to the Grass Lake property, and that it acquired such title during the life of the United States' tax liens in ASR's name. (Br. at 11.)  It is also undisputed that the IRS made federal tax assessments in ASR's name; that the IRS sent ASR notices of those assessments and demands for their payment; and that those assessments remain unpaid. (Def.'s Br. at 3, 11; Estrada Aff.)  Consequently, the United States' federal tax liens in ASR's name arising from ASR's unpaid federal tax assessments in the amount of $11,766,096.18, as of March 29, 2004, have attached, as a matter of law, to the Grass Lake property such that the property should be foreclosed and sold.  The United States is, therefore, entitled to summary judgment on its counterclaim seeking the foreclosure and sale of the Grass Lake property in satisfaction of the federal tax liens in ASR's name.

## IV.  SUMMARY

For the preceding reasons, the Court GRANTS summary judgment to Defendant United States on its counterclaims, and DENIES Plaintiff GLASR summary judgment as to GLASR's quiet-title claim against the United States and as to the United States' counterclaim.

SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: **AUG 2 9 2005**
Detroit, Michigan

---

[31]As GLASR underscores, Novelli's affidavit directly impugns Moscoso's testimony and affidavit regarding Novelli's alleged disregard of corporate formalities. (Resp. at 10, 12.)  However, even without Moscoso's testimony and affidavit, a reasonable jury could only conclude that GLASR is ASR's alter ego.  Thus, the credibility dispute between Moscoso and Novelli does not preclude summary judgment for the United States.